THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: August 19, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re OEP Enterprises, Inc.*

_____

Serial No. 87345596

_____

Michael J. Marcin of Fay Kaplun & Marcin, LLP for OEP Enterprises, Inc.

Janet H. Lee, Trademark Examining Attorney, Law Office 124,
     Lydia Belzer, Managing Attorney.

_____

Before Zervas, Goodman, and Larkin,
     Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

OEP Enterprises, Inc. ("Applicant") seeks registration on the Principal Register of

the proposed product configuration mark shown below:



for "umbrellas; beach umbrellas; beach umbrellas;[1] golf umbrellas; patio umbrellas," in International Class 18.[2]

The Trademark Examining Attorney refused registration of Applicant's mark on two grounds: (1) under Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), on the ground that the mark is a functional design for the goods; and (2) under Sections 1, 2, and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, and 1127, on the ground that the mark consists of a non-distinctive product design that has not acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f).

After the Examining Attorney made the refusal final, Applicant appealed and requested reconsideration, 5 TTABVUE, which was denied. 4 TTABVUE. The case is fully briefed. We affirm the refusal to register on both grounds.

## I.   Prosecution History and Record on Appeal

The involved application was filed by Windbrella Products Corporation ("Windbrella"), which claimed that the applied-for mark had become distinctive for the goods under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), based on the following evidence submitted with the application: (1) the declaration of Glenn Kupferman, Windbrella's founder and President, and Exhibits A-M thereto, including

---

[1] The term "beach umbrellas" is listed twice in the identification of goods.

[2] Application Serial No. 87345596 was filed on February 22, 2017 under Sections 1(a) and 2(f) of the Trademark Act, 15 U.S.C. §§ 1051(a) and 1052(f), based on claimed first use of the proposed mark and first use of the proposed mark in commerce at least as early as March 31, 1998. Applicant describes the mark as "a three-dimensional configuration of the goods, in the form of an umbrella with a two-tiered canopy, wherein the inner canopy consists mostly of mesh. The umbrella also has a handle, shaft, runner and ribs." Color is not claimed as a feature of the mark.

expired U.S. Patent No. D408,125 (the "'125 Design Patent"),[3] and two other design patents;[4] (2) the declarations of representatives of four sellers of Windbrella umbrellas, Michael Hubsmith of Coolibar, Inc.,[5] Russell Coulon of UV-Blocker, LP,[6] Harvey Wiesenberg of Haven Industries, Ltd.;[7] and Allen Willinsky of Casablanca Promotions, Inc.;[8] and (3) the declaration of Tracy Zobel, President of Aqua Sheen, a Windbrella competitor.[9]

The Examining Attorney issued a first Office Action refusing registration of Windbrella's claimed mark on the substantive grounds of functionality and lack of distinctiveness, and on additional grounds pertaining to Windbrella's specimen, drawing, and mark description.[10] The Examining Attorney also issued several requests for information pursuant to Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b), regarding the applied-for three-dimensional configuration mark.[11] She made of

---

[3] This patent expired on April 20, 2013.

[4] February 22, 2017 Application at TSDR 5-76. All citations to the record in this opinion are to pages in the Trademark Status & Document Retrieval ("TSDR") database of the United States Patent and Trademark Office ("USPTO"). We will cite Mr. Kupferman's declaration and the others in the record by paragraph and exhibit number (e.g., "Kupferman Decl. ¶ __; Ex. __").

[5] *Id.* at TSDR 77-79.

[6] *Id.* at TSDR 80-81.

[7] *Id.* at TSDR 82-83.

[8] *Id.* at TSDR 86-87.

[9] *Id.* at TSDR 84-85.

[10] May 22, 2017 Office Action at TSDR 1.

[11] *Id.*

record webpages that she claimed show that the applied-for mark was a nondistinctive configuration of the goods.[12]

Windbrella responded to the Office Action by submitting a substitute specimen, amending the description of the mark, arguing against the substantive refusals, and responding to the Examining Attorney's information requests, including disclosing that Windbrella owned an expired utility patent, U. S. Patent No. 5,890,506 (the "'506 Utility Patent").[13]

The Examining Attorney then issued a second Office Action making final the functionality, lack of distinctiveness, and insufficient specimen refusals.[14] She made of record a copy of the '506 Utility Patent.[15]

Applicant appealed and simultaneously filed a Request for Reconsideration in which it made of record various third-party double-canopy umbrellas,[16] and submitted a substitute specimen, a portion of which is reproduced below:

[12] *Id*. at TSDR 2-40.

[13] November 21, 2017 Response to Office Action at TSDR 1-7. Windbrella assigned the application to Applicant under an assignment that was recorded in the USPTO on December 28, 2017 under Reel/Frame 6237/0929. The '506 Utility Patent expired on February 24, 2017, two days after this application to register the umbrella design was filed.

[14] December 9, 2017 Final Office Action at TSDR 1.

[15] *Id*. at TSDR 2-12.

[16] 5 TTABVUE 12-19 (June 11, 2018 Request for Reconsideration).



## II. Functionality Refusal

### A. Defining Applicant's Claimed Mark

Before addressing the merits of the functionality refusal, "'we first must define what Applicant intends to claim as a trademark,'" *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1487 (TTAB 2017) (quoting *In re Heatcon, Inc.*, 116 USPQ2d 1366, 1371 (TTAB 2015)), because on appeal Applicant and the Examining Attorney disagree about what comprises the mark.[18]

In its main brief, Applicant defines "Applicant's Mark" as "a mesh lower canopy of a double canopy umbrella." 7 TTABVUE 2. Applicant's discussion of functionality in its main brief and reply brief turns on this definition, as it argues in its main brief that "the use of mesh is an incidental aspect of the product," *id.*, and in its reply brief that the use of mesh is "just a design choice for the aesthetic look of the umbrella." 10 TTABVUE 3.

---

[17] *Id*. at 23. The Examining Attorney accepted the substitute specimen. 4 TTABVUE 2 (June 29, 2018 Denial of Request for Reconsideration).

[18] Their dispute pertains primarily to the functionality refusal, but as discussed below, the definition of the applied-for mark is also relevant to the non-distinctiveness refusal. *See Kohler*, 125 USPQ2d at 1487 n.45.

The Examining Attorney, on the other hand, characterizes Applicant's mark as "a three-dimensional configuration of an umbrella comprising a handle, shaft, runner, ribs and double canopies incorporating a mesh component . . . ." 9 TTABVUE 3. She argues that "the handle, shaft, runner, ribs, and the solid canopies of the umbrella are not depicted in dotted lines to show that applicant is excluding them from the drawing," *id.* at 7, and that the refusal is thus "made as to the entire configuration of the umbrella." *Id.*

"Applicant's application 'drawing depicts the mark to be registered.'" *Kohler*, 125 USPQ2d at 1488 (quoting *Heatcon*, 116 USPQ2d at 1379) (citing Trademark Rule 2.52, 37 C.F.R. § 2.52)); *see also In re Change Wind Corp.*, 123 USPQ2d 1453, 1459 n.6 (TTAB 2017) ("[T]he drawing of the mark, not the words an applicant uses to describe it, controls what the mark is"); *In re Thrifty, Inc.*, 274 F.3d 1349, 61 USPQ2d 1121, 1123 (Fed. Cir. 2001). Further, "'[p]roduct configuration marks require special form drawings and must depict matter not claimed as part of the mark in broken lines. Broken lines must also be used to indicate placement of the mark.'" *Kohler*, 125 USPQ2d at 1488 (quoting *Heatcon*, 116 USPQ2d at 1379). As the Examining Attorney correctly notes, there are no broken lines in the application drawing (shown again below):



to indicate that Applicant claims as its mark only "a mesh lower canopy of a double canopy umbrella." 7 TTABVUE 2. If Applicant intended to claim only "a mesh lower canopy of a double canopy umbrella," *id.*, "it would have made that clear in its application for registration" by lining the drawing accordingly. *In re Bose Corp.*, 476 F.3d 1331, 81 USPQ2d 1748, 1753 (Fed. Cir. 2007) (holding that the applicant was "seeking protection of its entire pentagonal-shaped design, not only its curved front edges," because it did not limit its drawing accordingly).

We may also consider Applicant's description of its mark in the application itself, *Kohler*, 125 USPQ2d at 1488 n.48, although "we are not bound by what Applicant describes its mark to be in its application or in its brief." *Id.* (citing *In re Becton, Dickinson and Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1374 (Fed. Cir. 2012) and *Change Wind*, 123 USPQ2d at 1459 n.6). As noted above, Applicant described the applied-for mark in the application as "a three-dimensional configuration of the goods, in the form of an umbrella with a two-tiered canopy, wherein the inner canopy

consists mostly of mesh," which "also has a handle, shaft, runner and ribs."[19] Unlike Applicant's description of its mark in its briefs, its description in its application comports more closely with the drawing. *Cf. Change Wind*, 123 USPQ2d at 1455 (amended description of mark as "consist[ing] of a three-dimensional configuration of a wind powered turbine for generating electricity" stated that "the matter shown in broken or dotted lines" in application drawing "is not part of the mark and serves only to show the position or placement of the mark"). Accordingly, we agree with the Examining Attorney that the functionality "refusal is made as to the entire configuration of the umbrella," 9 TTABVUE 7, and we will thus assess the functionality of the entire mark as it is shown and described in the application, not as Applicant characterizes it on appeal. *Kohler*, 125 USPQ2d at 1488.[20]

## B. Summary of the Law of Functionality

Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), prohibits registration of "a mark which … comprises any matter that, as a whole, is functional." A product design that is functional is "incapable of serving as a trademark." *Grote Indus., Inc. v. Truck-Lite Co.*, 126 USPQ2d 1197, 1202 (TTAB 2018), *appeal docketed*, No. 1:18-cv-00599 (W.D.N.Y. May 24, 2018).

"Generally, a product design or product feature is considered to be functional 'if it is 'essential to the use or purpose of the article or if it affects the cost or quality of the

---

[19] November 21, 2017 Response to Office Action at TSDR 4 (accepting Examining Attorney's proposed amendment to the description of the mark).

[20] We will also consider the mark as shown and described in the application with respect to the refusal based on lack of acquired distinctiveness.

article.'" *Id.* (quoting *TrafFix Devices Inc. v. Mktg. Displays Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001) (quoting and citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163-64 (1995) and *Inwood Labs, Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982)).[21]

The functionality doctrine is intended to encourage legitimate competition by maintaining the proper balance between patent law and trademark law. The doctrine

> prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time . . . after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

*Qualitex*, 34 USPQ2d at 1163.

To determine whether a product design is functional under the *Inwood* test, "we are also guided by the analysis first applied in *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982)." *Change Wind*, 123 USPQ2d at 1456; *see also Becton, Dickinson*, 102 USPQ2d at 1377-78 (applying *Morton-Norwich* factors). As the Board explained in *Change Wind*,

> *Morton-Norwich* identifies four nonexclusive categories of evidence which may be helpful in determining whether a particular design is functional: (1) the existence of a utility patent disclosing the utilitarian advantages of the design;

---

[21] For ease of reference, we will identify the functionality standards set forth by the Supreme Court in these cases as the "*Inwood* test."

> (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product.

*Id.* (citing *Morton-Norwich*, 213 USPQ at 15-16). "The *Morton-Norwich* categories 'are not exclusive, however, for functionality depends upon the totality of the evidence.'" *Kohler*, 125 USPQ2d at 1489 (quoting *Heatcon*, 116 USPQ2d at 1370 (internal quotation omitted)). The Supreme Court has made it clear "that if evidence such as statements in a relevant utility patent or the applicant's own promotional materials establishes that the design is functional under the *Inwood* formulation of the test, further inquiry into the existence of alternative designs or whether there is a competitive necessity for the feature is unnecessary." *Change Wind*, 123 USPQ2d at 1456 (citing *TrafFix*, 58 USPQ2d at 1006).

"In determining whether [a] product configuration is functional, we focus on whether the configuration *as a whole* is functional." *Kistner Concrete Prods., Inc. v. Contech Arch Techs., Inc.*, 97 USPQ2d 1912, 1919 (TTAB 2011); *see also* 15 U.S.C. § 1052(e)(5) (prohibiting registration of a mark that "comprises any matter that, as a whole, is functional."); *Becton, Dickinson*, 102 USPQ2d at 1376 ("one object of the *Morton-Norwich* inquiry is to weigh the elements of a mark against one another to develop an understanding of whether the mark as a whole is essentially functional and thus non-registrable"). The statutory terminology "as a whole" refers to "'the entirety of the mark itself,'" *Kistner Concrete*, 97 USPQ2d at 1919 (quoting *Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1428 n.6 (Fed. Cir. 2002)),

and "does not mean that one can avoid a finding of functionality simply because the configuration includes a nonfunctional feature." *Id.* at 1920.

"In considering the applied-for mark as a whole, our primary reviewing court has recognized that the initial analysis may be of the separate features of the involved configuration, followed by consideration of the entire design." *Change Wind*, 123 USPQ2d at 1456 (citing *Becton, Dickinson*, 102 USPQ2d at 1376 and *In re R. M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 2 (Fed. Cir. 1984)). The Federal Circuit's functionality precedent "mandates that the Board conduct such an assessment as part of its determination of whether a mark in its entirety is overall de jure functional." *Becton, Dickinson*, 102 USPQ2d at 1376.

Following the above precedents as to functionality, we will address the separate parts of the umbrella in turn, beginning with the parts whose functionality is undisputed by Applicant and proceeding to the parts of the umbrella whose functionality is disputed.

**C. Functionality of the Handle, Shaft, Runner, and Ribs of the Umbrella**

With respect to the handle, shaft, runner, and ribs, the Examining Attorney argues that

> [t]he handle of the umbrella is functional because users will use it to hold and/or operate the umbrella. The ribs, shaft and runner of the umbrella are functional because they hold up the umbrella and enable the umbrella to fold and open. The canopy of the umbrella is functional because it blocks the rain or sunlight from the user.

9 TTABVUE 8. She cites Applicant's statements during prosecution that it "does not contend that the handle, shaft, runner, or ribs of the umbrella [are] non-functional."[22] On appeal, Applicant does not dispute that these features of the umbrella are functional, or that the upper canopy of the double-canopy design in the applied-for mark "blocks the rain or sunlight from the user." *Id.* We thus agree with the Examining Attorney that these features in the applied-for mark are functional, and we consider whether the mesh canopy is also functional or, if it is not, whether its non-functionality makes the applied-for mark as a whole non-functional.

### D. Functionality of the Mesh Canopy of the Umbrella

### 1. Arguments Regarding the '506 Utility Patent and '125 Design Patent

For ease of reference in following our summary of Applicant's and the Examining Attorney's arguments regarding the patents, we depict immediately below the figure from the '506 Utility Patent for a dual-canopy umbrella that contains the numbers that correspond to those referenced in Applicant's argument, as well as a figure from the '125 Design Patent for Applicant's dual-canopy umbrella.

---

[22] November 21, 2017 Response to Office Action at TSDR 2; 5 TTABVUE 6 (June 11, 2018 Request for Reconsideration).


**(from '506 Utility Patent)**


**(from '125 Design Patent)**

### a. Applicant's Arguments

Applicant characterizes the patents as "inconclusive as to the issue of functionality." 7 TTABVUE 4. Applicant argues that the '506 Utility Patent "makes it clear that there are two canopies, an upper canopy 24 that includes an air intransmissible portion and a lower canopy 22 that includes an air transmissible portion." *Id.* Applicant argues that the "specification describes [that] the air transmissible material may be, for example, a mesh material," *id.*, but that "none of the independent claims recite that the air transmissible material is mesh," *id.*, which in Applicant's view "clearly indicates that the air transmissible portion may be

materials other than mesh." *Id.* at 4-5.[23] Applicant claims that there "are many other types of air transmissible lower canopies on the market," and that the "fact that air transmissible material could be mesh does not make the mesh material functional." *Id.* at 5.

Applicant also argues that a "review of the prosecution history of the '506 patent shows that the mesh material did not lead to a finding of patentability," but that "it appears that patentability rested on the fact that the lower canopy included three portions, an air transmissible annular perimeter portion 22, an air transmissible annular opening 30, and a central upper most substantially air transmissible portion 22." *Id.*[24]

Applicant also discusses the '125 Design Patent, which has a single claim of the "ornamental design for an umbrella, as shown and described." Applicant argues that it "is a continuation-in-part (CIP) of the '506 patent" and that the "added subject matter in the CIP application is Figs. 4 and 5 of the '125 design patent." *Id.* According to Applicant, "because of the priority claim, the Examiner of the design application

---

[23] The '506 Utility Patent explains that "[b]y 'substantially air intransmissible" is meant that the material presents a barrier to wind gusts, i.e., does not allow wind gusts to pass through, even though the material may 'breath' somewhat, or allow some air to permeate through," and that "by 'substantially air transmissible' is meant that wind gusts can pass through." December 9, 2017 Final Office Action at TSDR 8, col. 5, lines 41-47.

[24] The prosecution history of the '506 Utility Patent is not of record. Applicant's argument is based on language in the issued patent, 7 TTABVUE 5 (citing "'506 patent, col. 5, lines 37-48 and Fig. 5"), and argument of counsel regarding the examination of the continuation-in-part application ("CIP Application") that resulted in issuance of the '125 Design Patent, the file history of which is also not of record. *Id.* As discussed below, Applicant also speculates about the examination of the CIP Application. *Id.* at 5-6. To the extent that Applicant believed that the prosecution histories of the patents were relevant, it was obligated to make the pertinent portions of those files of record. In their absence, we give no weight to Applicant's arguments regarding what occurred during the prosecution of the patents and why they issued.

should have been aware of the application that led to the '506 patent when examining the design application," and a "review of the '125 design patent and cited art shows that the feature that distinguishes the '125 design patent from the prior art is the mesh." *Id.* at 5-6. Applicant concludes that "it appears that a patent Examiner believed the mesh to be non-functional, while the trademark Examining Attorney believes the mesh to be functional," that "this determination rebuts the Examining Attorney's conclusion based solely on the existence of the '506 patent and the few statements within the '506 patent," and that "the existence of the '506 patent and the '125 design patent render [sic] this factor inconclusive for determining functionality." *Id.* at 6.

In its reply brief, Applicant clarifies that its "argument is that the independent claims are not limited to mesh." 10 TTABVUE 3. Applicant argues that "there are many other air transmissible fabrics that can be used in the lower canopy" of the invention. *Id.* Applicant further argues that the application drawing "is a figure from the '125 design patent" and notes that the Examining Attorney "has asserted that the handle, the ribs, the shaft, the runner and the canopy is [sic] functional." *Id.* at 4. Applicant asks "[w]hat is left to be the non-functional ornamental design required for a design patent but the lower mesh canopy[?]" *Id.* Applicant concludes that the '125 Design Patent "is a key piece of evidence showing the lower mesh canopy is nonfunctional and cannot be dismissed out of hand as the Examining Attorney has done." *Id.*

**b. The Examining Attorney's Arguments**

The Examining Attorney argues that the '506 Utility Patent "claims the design features at issue" because "[c]ontrary to applicant's assertions that mesh is not recited as independent claims, Claim number 2 in the '506 patent specifically states, 'The umbrella of claim 1, wherein the air transmissible material comprises a mesh material'," and "[t]his language is repeated throughout the patent in Claims 14, 28, and 32." 9 TTABVUE 9. She also argues that the '506 Utility Patent "lists the advantages of having the mesh material that comprises a substantial portion of the lower canopy" and "touts the superiority of its invention by noting that the presence of the mesh materials provides more strength to the lower canopy and keeps it taut when compared to the alternative designs with cut outs or with merely an opening." *Id.* at 11.

With respect to the '125 Design Patent, the Examining Attorney argues that Applicant incorrectly "claims that the Patent Office has determined that the mesh portion is the distinguishing factor enabling the granting of the '125 design patent [and that] the mesh portion is not covered in the '506 utility patent and [is] nonfunctional" because it "is clearly stated in the claims of [the] '506 patent that the air transmissible material is a mesh material." *Id.* at 12. The Examining Attorney acknowledges that "a design patent is evidence of nonfunctionality under *Morton-Norwich*," *id.*, but argues that "such evidence does not in itself establish that a product feature is nonfunctional; thus this evidence may be outweighed by other evidence of functionality." *Id.* at 12-13. She argues that the '125 Design Patent "has

little evidentiary value as to whether the mesh portion is functional or not," *id.* at 13, and concludes, on the basis of the '506 Utility Patent, that she "has established a prima facie case that the applied-for mark is functional and the burden of proof now shifts to applicant to show nonfunctionality." *Id.* at 9.

### 2. Patent Evidence

### a. '125 Design Patent

We begin our analysis with the '125 Design Patent because Applicant correctly notes that the mark in the application drawing is shown in the '125 Design Patent. The application drawing, reproduced first below, corresponds to Figure 3 in the '125 Design Patent, reproduced second below:





FIG.3        25

Because the '125 Design Patent covers the applied-for mark as shown in the application drawing, we agree with Applicant that the '125 Design Patent is evidence of non-functionality. "Our law recognizes that the existence of a design patent for the

---

[25] Kupferman Decl. ¶ 29; Ex. J. Figure 3 is described in the '125 Design Patent as "a bottom perspective view thereof." *Id.*

very design for which trademark protection is sought 'presumptively . . . indicates that the design is not *de jure* functional.'" *Becton, Dickinson*, 102 USPQ2d at 1377 (quoting *Morton-Norwich*, 213 USPQ at 17 n.3); *cf. Grote Indus.*, 126 USPQ2d at 1206 n.25 (finding that a design patent covering a different type of lighting product was not probative of the functionality of the defendant's vehicle light); *In re Loggerhead Tools, LLC*, 119 USPQ2d 1429, 1432-33 (TTAB 2016) (finding that a design patent depicting a tool with five gripping elements rather than the six shown in the trademark application drawing was "not on point," and did not overcome effect of disclosure of the utilitarian advantages of the claimed mark made in a utility patent).

At the same time, however, the '125 Design Patent is not dispositive of non-functionality. The "'fact that a device is or was the subject of a design patent does not, without more, bestow upon said device the aura of distinctiveness or recognition as a trademark.'" *Becton, Dickinson*, 102 USPQ2d at 1377 (quoting *R.M. Smith*, 222 USPQ at 3). We must examine the totality of the evidence, including the '506 Utility Patent, to which we now turn.

**b. '506 Utility Patent**

"The first *Morton-Norwich* category assesses whether a utility patent discloses the utilitarian advantages of the design." *Poly-America, L.P. v. Ill. Tool Works Inc.*, 124 USPQ2d 1508, 1514 (TTAB 2017). "A utility patent is strong evidence that the claimed features for which an applicant or registrant seeks trademark protection are essential to the use or purpose of the article (or affect the cost or quality of the item), and may constitute sufficient evidence of functionality standing alone." *Grote Indus.*,

126 USPQ2d at 1203 (citing *TrafFix*, 58 USPQ2d at 1005). "A utility patent need not 'claim the exact configuration for which trademark protection is sought in order to undermine an applicant's assertion that an applied-for mark is not de jure functional.'" *Id.* (quoting *Becton, Dickinson*, 102 USPQ2d at 1377). "We consider the entirety of a patent—both claims and disclosures—and have found functional applied-for marks depicting the preferred embodiment described in a utility patent." *Id.* at 1205 (citations omitted).

In the '506 Utility Patent, the "Background of the Invention" explains that "[v]arious umbrella designs, and in particular designs for minimizing the effects of gusts of wind on umbrellas are known," but that "[t]here is a need for an improved umbrella which allows air due to wind impinging on the concave undersurface of the umbrella to escape to minimize the effects of the wind on the umbrella."[26] The "Summary of the Invention" states that the invention has various objectives, including to "provide an improved umbrella which minimizes the effects on the umbrella of gusts of wind," to "provide an improved umbrella which minimizes the tendency of the umbrella to invert due to wind impinging on the lower concave portion of the umbrella," and to "provide a simple, sturdy umbrella which minimizes the effects of the wind and helps to harmlessly vent wind gusts impinging on the concave underside of the umbrella."[27]

---

[26] December 9, 2017 Office Action at TSDR 6.

[27] *Id.*

The utilitarian advantages of the use of a mesh lower canopy in achieving each of these objectives are discussed in the "Detailed Description of Embodiments of the Invention" (the "Specification"), which makes it clear that the use of mesh in the umbrellas and umbrella canopies claimed in the invention has significant benefits over the prior umbrella art.[28] The Specification states that the "substantially annular[29] opening **30** is filled by an air transmissible flexible mesh material **32**, for example, of nylon, as shown most clearly in FIGS. **3**, **5**, and **5A**."[30] We again reproduce Figure 5 for ease of reference in following our discussion of the Specification, which is described in the '506 Utility Patent as "an exploded perspective view of the umbrella showing the upper and lower canopy portions thereof disassembled."[31]

---

[28] As discussed above, Applicant effectively conceded during prosecution that the features of the applied-for mark other than the mesh canopy are functional, and the Background of the Invention in the '506 Utility Patent describes in detail how the handle, ribs, shaft, runner, and upper canopy contribute to the achievement of the several objectives of the invention, including avoiding inversion of the umbrella. *Id*. at TSDR 6-7 (col. 1, line 65-col. 4, line 49).

[29] The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed form or regular fixed editions. *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983); *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006). We take judicial notice that "annular" means "of, relating to, or forming a ring." MERRIAM-WEBSTER DICTIONARY (merriam-webster.com, last accessed on August 19, 2019).

[30] December 9, 2017 Final Office Action at TSDR 8 (col. 5, lines 47-50).

[31] *Id*.



"The mesh is sewn to the material of each portion **22A**' of the perimeter portion **22**' at a joining line **34**, and also sewn to each portion **22A**" of the central portion **22**" at a joining line **35**."[33] As a result, "each triangular shaped member **22A** comprises an upper triangular shaped member **22A**, a portion **32**' of the mesh material **32** which is essentially formed in the shape of a truncated cone and the lower portion **22A**' also shaped in the form of a truncated cone."[34]

The Specification explains that "[t]he mesh material **32** provides an escape route for air gusts impinging on the concave lower surface of the umbrella when it is in a deployed state," and states that "**[t]he mesh material also provides strength to the entire first canopy portion 22, helping to keep the first canopy portion**

---

[32] *Id*. at TSDR 5.

[33] *Id*. at TSDR 8 (col. 5, lines 50-53).

[34] *Id*. (col. 5, lines 53-58).

**taut. This is in contrast to some of the prior art designs that have die cut holes in the lower canopy.**"[35]

The Specification also describes how the mesh material reduces umbrella inversion:

> When gusts of wind impinge on the lower concave side of the umbrella, the air passes through the mesh material **32** as shown by arrow **40**A and bears against the lower surface. This causes the upper canopy portion **24** to flex upwardly and/or the lower canopy portion to move downwardly, thereby forming a channel **41**, venting the air, as indicated by the arrow **40**C. The upper canopy portion **24** is provided on the lower canopy portion **22** so that it is substantially taut. The lower canopy portion **22** is likewise substantially taut, and is maintained taut by the presence of mesh **32** in air transmissible portion **30**.[36]

The Specification also claims that the "**mesh material 32** located between the sections **22**' and **22**" **helps to maintain the strength of the lower canopy of the umbrella structure, in contrast to some of the prior art, where holes are provided in the lower covering**,"[37] and states that in "the preferred embodiment of the invention, the upper canopy portion **24** is substantially as taut as the lower canopy portion **22** when the umbrella is in its deployed state."[38]

The Specification describes additional benefits of the use of mesh material in the lower canopy as follows:

---

[35] *Id.* (col. 5, lines 61-68) (emphasis added).

[36] *Id.* (col. 6, lines 28-39) (non-numerical emphasis added). The venting effect of the mesh material is illustrated in Figure 4. *Id.* at TSDR 4.

[37] *Id.* (col. 6, lines 58-61) (non-numerical emphasis added).

[38] *Id.* (col. 6, lines 62-64).

The **mesh material 32** of the lower canopy portion **32 allows more wind to pass through, in contrast to the prior art designs**. **The mesh lining 32 also adds stability and rigidity to the lower canopy portion. It also provides a clean finish to the concave underside of the umbrella**. Some of the prior art designs utilize die cut vent holes in the covering material of the lower canopy for the wind to pass through. **These designs do not utilize a mesh material. This creates a problem because the die cut holes in the covering material, for example, nylon, fray around the edges**. . . . The mesh material of the present invention comprises about 35 to 40% of the lower canopy surface area, thus improving flow. Some of the prior art designs utilize about less than 20% of the lower canopy portion for air flow. This is in particular true of such designs employing cut holes. **Accordingly, the present invention has significantly greater airflow than the prior art designs**. The greater the surface area of the mesh material, the greater amount of air which will flow, thereby preventing the umbrella from inverting.[39]

Finally, the Specification states that the use of mesh material is beneficial in the process of manufacturing umbrellas:

**An additional advantage of the invention from a manufacturing standpoint is that the mesh portions 32 are easier to sew along the panel seams.** The mesh will keep all the panels of the umbrella uniform, giving it a clean finish and a quality appearance. **In the prior art, the use of die cut holes in the lower canopy portion causes problems.** For example, when die cutting the holes, the covering material, generally nylon, is stacked about 20 to 40 pieces high. This will cause some of the panels to shift during the cutting process. The shifting will cause the vent holes to be die cut off center and result in

---

[39] *Id*. at TSDR 9 (col. 7, lines 9-18, 38-47 (non-numerical emphasis added). The "clean finish" of the umbrella discussed in the Specification was echoed by each of Applicant's third-party declarants. Hubsmith Decl. ¶¶ 10-11 ("the vented mesh double canopy design enhances the appearance of a clean looking umbrella" and the "mesh gives the Windbrella a clean design look that no other double canopy umbrella can show"); Coulon Decl. ¶ 9 (the "mesh gives the Windbrella a clean design look that no other double canopy umbrella can show"); Wiesenberg Decl. ¶ 9 (same); Zobel Decl. ¶ 9 (same); Willinsky Decl. ¶ 9 (same).

> uneven assembly when the panels are sewn together. **Furthermore, the cost factor of the mesh material as compared to die cut vent holes after waste of unevenly cut panels is less than the cost of die cutting the vent holes. In addition, the mesh panels are also more rigid, making it easier to sew them than panels with die cut vent holes.**[40]

Our primary reviewing court's decision in *Becton, Dickinson* makes clear that the fact that a disclosure of the benefits of a particular feature appear in the specification, rather than in one or more claims, of a patent or patent application does not matter. 102 USPQ2d at 1377 ("*TrafFix* teaches that statements in a patent's specification illuminating the purpose served by a design may constitute equally strong evidence of functionality"). We find that the excerpts reprinted above are strong evidence that the mesh element has direct utilitarian and economic benefits.

Turning to the claims in the '506 Utility Patent, independent claim 1 and the other independent claims describe the functions of the "two-tiered canopy" and the "handle, shaft, runner and ribs" elements of the description of the applied-for mark in the application. The "inner canopy consist[ing] mostly of mesh" contained in the description is expressly claimed in several dependent claims.[41] Dependent claim 2 claims the "umbrella of claim **1**, wherein the air transmissible material comprises a

---

[40] December 9, 2017 Final Office Action at 9 (col. 7, lines 48-65).

[41] In an application for a patent, "[o]ne or more claims may be presented in dependent form, referring back to and further limiting another claim or claims in the same application." 37 C.F.R. § 1.75. As discussed below, the pertinent dependent claims in the '506 Utility Patent refer back to various independent claims and add mesh material as a further limitation on the independent claims. Applicant surprisingly states that "mesh is included in the independent claims by virtue of the fact that several dependent claims recite mesh," but argues correctly "that the independent claims are not limited to mesh." 10 TTABVUE 3.

mesh material."[42] Dependent claim 3 claims the "umbrella of claim **2**, wherein said mesh material comprises substantially all of the said second portion of said first canopy portion."[43] Dependent claim 28 claims the "umbrella of claim **26**, wherein the air transmissible material comprises a mesh material."[44] These claims teach all elements of the applied-for mark, including the lower mesh canopy on which Applicant focuses on appeal.[45] The fact that the mesh element also appears in the claims confirms what the Specification makes explicit: the mesh element has utilitarian benefits. Both the claims and the Specification thus support a finding of functionality. *See Becton, Dickinson*, 102 USPQ2d at 1377; *In re Howard Leight Indus., LLC*, 80 USPQ2d 1507, 1510-11 (TTAB 2006).

Notwithstanding the extensive discussion of the mesh canopy in the '506 Utility Patent, Applicant argues that "the use of mesh is an incidental aspect of the product," 7 TTABVUE 2, and "just a design choice for the aesthetic look of the umbrella." 10 TTABVUE 3. These arguments are belied by Applicant's promotional materials, which refer to its "Patented Windbrella Vented Mesh System™":[46]

---

[42] December 9, 2017 Final Office Action at TSDR 9 (col. 8, lines 63-64).

[43] *Id*. (col. 8, lines 65-67).

[44] *Id*. at TSDR 11 (col. 12, lines 15-16). Claim 26 covers a particular form of umbrella.

[45] Dependent claims 14, 15, and 32 relate to umbrella canopies claimed in independent claims 13 and 30, and teach the use of mesh material for the canopies.

[46] Kupferman Decl. ¶ 17; Exs. A-C. Applicant's June 11, 2018 substitute specimen uses the registration symbol with this term. 5 TTABVUE 23.



**PATENTED WINDBRELLA VENTED MESH SYSTEM™**

**GOLF:** Oversized 62"/68" venting canopy, all fiberglass frame construction. Lightweight and flexible. Resists inversion in high winds.

**FASHION:** Large 48" venting canopy, push button Auto-open mechanism. Matching wood shaft, tips, and handle.

**GEORGETOWN FOLDER™:** Oversized venting canopy. Compact folding model (folds for convenient storage) Push button Auto-Open Handle.

[47]

This promotional document is consistent with the Specification: it highlights the "Patented Windbrella Vented Mesh System" and touts its ability to "[r]esist[ ] inversion in high winds."[48] As discussed above, according to the '506 Utility Patent, the use of mesh enhances the stability, rigidity, and tautness of the lower canopy portion of a two-canopy umbrella; provides "significantly greater air flow," which reduces the likelihood of umbrella inversion; reduces the fraying of the material around the edges; and promotes several efficiencies in manufacture.

The Specification acknowledges that "[a]lthough the present invention has been described in relation to particular embodiments thereof, many other variations and modifications and other uses will become apparent to those skilled in the art," and

---

[47] November 21, 2017 Response to Office Action at TSDR 7.

[48] *See also* Kupferman Decl. ¶ 17; Ex. C.

states that "the present invention should be limited not by the specific disclosure herein, but only by the appended claims."[49]

As noted above, Applicant argues that "none of the independent claims recite that the air transmissible material is mesh" and that "this clearly indicates that the air transmissible portion may be materials other than mesh." This technical distinction is immaterial, especially where, as here, the benefits of the mesh feature are detailed in the Specification and appear in some of the claims. The '506 Utility Patent as a whole, and Applicant's characterization of the invention as its "Patented Windbrella Vented Mesh System" and promotion of that "system," make clear that mesh is the material used in the preferred embodiment of the invention due to the benefits and efficiencies realized through its use.

The disclosures and claims of the '506 Utility Patent regarding the mesh canopy are powerful evidence that this feature of the applied-for mark, like the other features shown and described in the application, is functional. *See Poly-America*, 124 USPQ2d at 1519 (disclosure of applied-for color mark in sixth claim of utility patent "established functionality under *Inwood*"); *cf. Change Wind*, 123 USPQ2d at 1457 (applied-for mark for wind turbines and wind-powered electricity generators held to be functional where "both the disclosures and the claims of the patent reveal that the shape of the housing and the use of helical wings and their placement are not merely arbitrary, ornamental, or incidental, but serve an essential function in the invention

---

[49] December 9, 2017 Final Office Action at TSDR 9 (col. 8, lines 6-11).

for the [turbine], and that these features are necessary for its use"); *Heatcon*, 116 USPQ2d at 1371-73.

The strong and explicit evidence from the '506 Utility Patent that the applied-for mark as a whole is functional rebuts any initial presumption of non-functionality resulting from the existence of the '125 Design Patent. In fact, we view the disclosures in the '506 Utility Patent as so strong as to be sufficient, by themselves, to sustain the functionality refusal without consideration of the other *Morton-Norwich* categories of evidence. *See Grote Indus.*, 126 USPQ2d at 1203. In the interest of completeness, however, we will discuss the record evidence regarding the other categories.

### 3. Advertising and Other Materials Touting the Utilitarian Advantages of the Applied-for Mark

"'If a seller advertises the utilitarian advantages of a particular feature of its product, this constitutes strong evidence of functionality.'" *Kohler*, 125 USPQ2d at 1502 (quoting *Kistner Concrete*, 97 USPQ2d at 1924). The Examining Attorney claims that "Applicant's advertising also touts the functionality of applicant's design of the umbrella." 9 TTABVUE 10. She cites two advertisements made of record by Applicant with its application, and a *New York Times* article in which Mr. Kupferman is quoted. *Id.* We reproduce below the pertinent portions of the cited advertisements:



The Examining Attorney argues that these advertisements are evidence of functionality because they state respectively that Applicant's umbrella "offers superior protection and will not invert even in high winds thanks to an innovative double-overlapping canopy design that allows wind to pass through while keeping rain out," and that Applicant's "[v]ented technology allows umbrellas to withstand wind gusts up to 60 mph. without inverting." 9 TTABVUE 10. She further argues that the *New York Times* article states that Mr. Kupferman "invented the design of

---

[50] Kupferman Decl. ¶ 18; Ex. D (Hammacher Schlemmer catalog).

[51] *Id.* (Cadillac Collection 2002-2003 catalog).

the two-tiered umbrella with a mesh center to enable the flow of air to solve the problem of inverting umbrellas." *Id.*

Applicant argues that the Hammacher Schlemmer advertisement "does not tout the mesh portion of the umbrella" and that "there is no mention of the word mesh in this ad," 7 TTABVUE 7, and that the Cadillac Collection advertisement "also makes no mention of the mesh whatsoever." *Id.* Applicant dismisses the *New York Times* article as a "puff piece" in which the reporter could not be expected "to make the distinction that the utility invention was the air transmissible center portion and the owner selected a design of mesh for that air transmissible portion." *Id.* at 8.

We do not find Applicant's arguments persuasive. Applicant does not address the substance of its advertisements beyond claiming that they do not discuss mesh, but as discussed above, Applicant's mark as shown and described in the application is not merely the mesh canopy, but rather the entire design of the umbrella. Even if some of Applicant's materials do not specifically discuss mesh, this would not preclude them from touting the utilitarian advantages of Applicant's umbrella design.

The Examining Attorney correctly notes, as we discuss above, that Applicant's advertising and promotional materials refer to its "Patented Windbrella Vented Mesh System" and "Patented double canopy mesh system." 9 TTABVUE 10. These references reflect Applicant's views that a mesh canopy is integral to the '506 Utility Patent, and that the patented design of the umbrella was an improvement over previous designs, particularly with respect to preventing inversion. *See Kistner Concrete*, 97 USPQ2d at 1925 ("[o]n several occasions, respondent's advertising refers

to its 'patented' design, clearly implying that, as was the case, respondent's arch-box design was an improvement on existing technology"). Applicant's materials also refer to its "Wind-Defying Umbrella" with an "innovative double-overlapping canopy design that allows wind to pass through while keeping rain out,"[52] and its "[v]ented technology [that] allows [the] umbrella to withstand wind gusts up to 60 mph. without inverting."[53] These are among the utilitarian benefits of the design discussed in the '506 Utility Patent. Applicant's materials also mention discrete features such as an "[e]rgonomic rubber coated handle with auto-open and auto-close,"[54] and "[f]iberglass frame, ribs and spreaders,"[55] and claim generally that Windbrella's patented umbrellas are superior to other umbrellas:



The advertisements cited by the Examining Attorney, and the others in the record (some of which are discussed and shown below in our analysis of acquired

---

[52] *Id*. (Hammacher Schlemmer catalog) Application at TSDR 42.

[53] *Id*. (Cadillac Collection 2002-2003 catalog) Application at TSDR 45.

[54] *Id*. ¶17; Ex. B *(*Application at TSDR 21).

[55] *Id*.

[56] *Id*. ¶ 17; Ex. C (Application at TSDR 25).

distinctiveness), generally tout the ability of the design of the umbrella to prevent inversion and the design's superiority to previous designs.

The *New York Times* article cited by the Examining Attorney shows one of Applicant's umbrellas:



and describes it as having "two layers of nylon canopy. The lower layer has a mesh center, for venting; updrafts of air flow through the mesh and between the canopies instead of being caught, as they are in most umbrellas. The flow causes less air pressure on the umbrella – and fewer inversions."[58] The article also quotes Mr. Kupferman as describing what the author calls the "concept" of the umbrella as "basically an air-release valve."[59]

The article echoes, in very general terms, the explanation of the benefits of the invention in the '506 Utility Patent. Like the actual advertising and promotional materials, the article "address[es] the functionality of [the] design," *Kistner Concrete*, 97 USPQ2d at 1926 (discussing articles written by third parties about the involved

---

[57] *Id.* ¶ 23; Ex. H (Application at TSDR 51).

[58] *Id.*

[59] *Id.*

design), and describes the design's advantages in preventing inversion. We find that Applicant's advertising and promotional materials, and the *New York Times* article, provide some additional support for a finding of the functionality of the applied-for mark.

### 4. Availability of Alternative Designs

The Supreme Court has held that where, as here, a "design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive need for the feature." *TrafFix*, 58 USPQ2d at 1006. In that situation, "there is 'no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available,'" *Becton, Dickinson*, 102 USPQ2d at 1378 (quoting *Valu Eng'g*, 61 USPQ2d at 1427), and the "'availability of alternative designs does not convert a functional design into a non-functional design.'" *Kohler*, 125 USPQ2d at 1502 (quoting *Kistner Concrete*, 97 USPQ2d at 1928). Applicant, however, "submits that this factor overwhelmingly supports the Applicant's contention of non-functionality." 7 TTABVUE 8. Accordingly, we will consider Applicant's argument concerning the availability of alternative designs.

Applicant points to "multiple specific examples of other types of air transmissible lower canopies" that it made of record during prosecution, *id.*, including "a Gustbuster umbrella that included a teardrop cutout in the lower canopy" and "online screen shots of double-canopy umbrellas of many other competitors." *Id.*[60] Applicant argues

---

[60] "The record in the application should be complete prior to the filing of an appeal," Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d), and we decline Applicant's invitation in its

that "[t]his demonstrates that there are many alternative designs available for double-canopy umbrellas and, therefore, a trademark for the mesh design would not hinder competition." *Id.* at 9.

Applicant "also reminds the Board that the Applicant owned the '506 patent and the '125 design patent and enforced their rights under these patents,"[61] and claims that the "existence of these patents did not stifle competition in the least, as can be seen from the evidence submitted by the Applicant," and that the "granting of a trademark in the mesh design will similarly not stifle competition." *Id.* Applicant concludes that a "trademark in the lower mesh canopy will still allow the competitors to freely replicate important features of a fully functioning double-canopy umbrella" by "substitut[ing] the mesh fabric portion with other air transmissible materials in any other shape or form to allow air through the space between the upper and lower canopies of the umbrellas," which Applicant claims "will not put a competitor at a significant disadvantage because the feature is not essential to the use or purposes of the umbrella." *Id.*

The Examining Attorney does not directly address Applicant's arguments regarding the effect on competition of registration of Applicant's applied-for mark,

---

main brief "to do a simple search for a 'double canopy umbrella' on Amazon.com and see the hundreds (and possibly thousands) of these types of umbrellas for sale." 7 TTABVUE 9. Although we do not encourage the creation of unduly large records or the submission of cumulative materials, if Applicant believed that such a search would reveal evidence probative of non-functionality, it was incumbent upon Applicant to make such evidence of record.

[61] Applicant's arguments regarding enforcement lack citations to the record, but Mr. Kupferman discussed that topic in his declaration. Kupferman Decl. ¶¶ 26-27.

but she argues that "applicant's '506 patent lists the advantages of having the mesh material that comprises a substantial portion of the lower canopy." 9 TTABVUE 11.

The fact that there may be alternative two-canopy umbrella "designs is hardly surprising, or in and of itself, legally sufficient." *Kistner Concrete*, 97 USPQ2d at 1928. "The Federal Circuit has stated that the relevant question is whether the alternative designs work 'equally well.'" *Grote Indus.*, 126 USPQ2d at 1208 (quoting *Valu Eng'g*, 61 USPQ2d at 1427 (internal quotation omitted)). Applicant argues that "[t]here are many other types of air transmissible lower canopies on the market including various cutouts (e.g., circles, irregular shapes, etc.), no material at all, and other types of air transmissible materials," 7 TTABVUE 5,[62] but notably does not claim that the referenced "many alternative designs available for double-canopy umbrellas," *id.* at 9, work as well as Applicant's design.

The '506 Utility Patent states that the use of a mesh lower canopy involves a significant improvement over at least some of the alternative designs cited by Applicant on appeal. One "specific example of other types of air transmissible lower canopies in Exhibit M of the application" offered by Applicant is "a GustBuster umbrella that included a teardrop cutout in the lower canopy," *id.* at 5, which is reproduced below:

---

[62] The cited examples are shown at 5 TTABVUE 12-19.



Ferrule

Elastic
shock-cord

Shaft and runner

Teardrop-shaped
vent hole

Handle

63

The '506 Utility Patent, however, states that "[i]n the prior art, the use of die cut holes in the lower canopy portion causes problems,"[64] which are described as including less efficient manufacture, reduced strength and rigidity of the canopy, and fraying of the material around the edges.

Applicant has made no showing that lower canopies made of cutouts, "no material at all, and other types of air transmissible materials," 7 TTABVUE 5, work as well as the lower mesh canopy in the patented design. Similarly, Applicant has not shown that its "[c]ompetitors would be able to substitute the mesh fabric portion with other air transmissible materials in any other shape or form to allow air through the space between the upper and lower canopies of the umbrellas," *id.* at 9, and produce double-canopy umbrellas that work as well as the ones disclosed and taught in the '506 Utility Patent. Competitors are now free to produce the umbrellas taught in the '506 Utility Patent because it has expired, and competition would be inhibited if Applicant

---

[63] Kupferman Decl. ¶ 31; Ex. M.

[64] December 9, 2017 Final Office Action at TSDR 9 (col. 7, lines 54-55).

could use trademark law to prevent production of what Applicant claimed in the expired '506 Utility Patent to be a superior two-canopy umbrella design.[65] *See Qualitex*, 34 USPQ2d at 1163-64.

To the extent that this category of *Morton-Norwich* evidence is considered in view of the '506 Utility Patent, we find that it provides additional support for our conclusion that the applied-for mark as a whole is functional.

## 5. Whether the Applied-For Mark Results in a Comparatively Simple or Cheap Method of Manufacture

"[W]here a "design has *use*-related benefits, there is no need to determine whether the design also has *cost*-related benefits." *Kohler*, 125 USPQ2d at 1503. *See also TrafFix*, 58 USPQ2d at 1006 ("a product feature is functional . . . if it is essential to the use or purpose of the article **or** if it affects the cost or quality of the article") (emphasis added); internal quotation marks omitted). "While evidence that a product feature makes the product cheaper to make may be probative in showing functionality, evidence that it does not affect its cost is not necessarily proof of non-functionality." *Kohler*, 125 USPQ2d at 1503 (citing *Kistner Concrete*, 97 USPQ2d at 1930). In other words, evidence that a design costs more, or has no impact on cost, is irrelevant if the design is found to work better.

---

[65] Applicant cites multiple cases in which Applicant claims that "seemingly useful designs [were] found to be non-functional, thus registrable." 7 TTABVUE 12 n.3. The applied-for mark here is not simply "seemingly useful" (or "de facto functional") because the umbrella performs the function of shielding the user from rain and sun. It is also de jure functional because the '506 Utility Patent shows that it performs that de facto function better than comparable umbrellas without inverting.

Applicant argues that "this factor also weighs in favor of the Applicant." 7

TTABVUE 10. Applicant offers a "specific example . . . to contrast the manufacture

of Applicant's goods as opposed to other types of double canopy umbrellas," which

Applicant claims "show[s] that the non-functional mesh design feature adds both cost

and time to the manufacturing process." *Id.* That example involves the "typical

manufacturing process for the lower canopy," which Applicant claims "is to have

several pieces or panels of fabric that are generally in a triangular shape" and that

"are sewn together to form the circular lower canopy." *Id.* Applicant points to the

GustBuster double canopy umbrella,[66] which Applicant claims has teardrop cutouts

that "may be cut by a die to form the teardrop shape in each panel," and contrasts

this process with the manufacture of Applicant's lower canopy, which Applicant

claims involves "additional manufacturing steps and costs that need to be performed."

*Id.* at 11. Specifically, Applicant claims that

> the air intransmissible annular perimeter portion 22' of the
> panel needs to be sewn to the air transmissible center
> portion 34 (the mesh). Then, the air transmissible center
> portion 34 needs to be sewn to the central upper most
> substantially air intransmissible portion 22. Thus, instead
> of each panel being formed from a single piece of fabric,
> each panel of the Applicant's goods needs to be formed from
> three (3) different pieces of fabric that need to be sewn
> together. This extra sewing adds time and cost to the
> manufacturing process as the sewing is a much more time
> intensive process than the die cutting. In addition, the use
> of at least two different materials, *e.g.*, an air
> intransmissible nylon material and the air transmissible
> mesh material, also adds additional cost to the
> manufacturing process.

---

[66] Kupferman Decl. ¶ 31; Ex. M.

*Id.*

These assertions are unsupported by sworn statements or other evidence, and "'[a]ttorney argument is no substitute for evidence.'" *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 76 USPQ2d 1616, 1622 (Fed. Cir. 2005)). To the extent that Mr. Kupferman addresses cost in his declaration,[67] he does not discuss the manufacturing process, but merely states in conclusory fashion that the individual features of the umbrella, including the lower canopy, "do not negatively affect the quality or cost of the umbrella."[68] This double-negative statement is not a model of clarity. It could be read to mean that none of the features make the umbrella more costly or perhaps that none of the features makes it less costly. Either way, this statement has no pertinence to cost-related functionality. As explained earlier, the Specification of the '506 Utility Patent discusses in detail the manufacturing costs savings over the production of the prior umbrella art, including umbrellas with die cut holes, that are realized through the use of Applicant's design.[69] Whichever way we read Mr. Kupferman's declaration, it does not undermine the clear statements about cost savings in the '506 Utility Patent.

---

[67] *Id.* ¶¶ 29-32.

[68] *Id.* ¶ 29.

[69] December 9, 2017 Final Office Action at TSDR 9 (col. 7, lines 48-65).

On balance, we find that the applied-for mark has at least some cost-related benefits in addition to use-related ones. This category of *Morton-Norwich* evidence provides additional support for our finding that the applied-for mark is functional.

### 6. Summary and Conclusion Regarding Functionality

While the '125 Design Patent is some evidence that the applied-for mark is non-functional, we find it outweighed by the explicit disclosures of the utilitarian advantages of the applied-for mark in the '506 Utility Patent. Further supporting our determination is the absence of evidence that competitive alternatives that work as well as the applied-for design are available, as well as the existence of evidence indicating that the applied-for mark results in a more useful umbrella and a comparatively cheaper form of manufacture. We find accordingly that the applied-for mark as a whole is functional, and we affirm the refusal to register under Section 2(e)(5) of the Trademark Act.

### III. Lack of Acquired Distinctiveness Refusal

Our finding that the applied-for mark is functional is an absolute bar to its registration on either the Principal or Supplemental Register. 15 U.S.C. §§ 1052(e)(5), (f); *Change Wind*, 123 USPQ2d at 1467 (a "finding of functionality under Section 2(e)(5) precludes registration regardless of any showing of acquired distinctiveness under Section 2(f)"). In the interest of completeness, however, we now discuss the alternative ground for refusal of registration that the mark consists of a nondistinctive product design and that Applicant's evidence of acquired distinctiveness is insufficient to make it eligible for registration.

**A. Summary of the Law of Acquired Distinctiveness for Product Design**

We begin with the Supreme Court's teaching that "[c]onsumers are aware of the reality that, almost invariably, even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 54 USPQ2d 1065, 1069 (2000). "As a result, product designs can never be inherently distinctive and will always require evidence of acquired distinctiveness or secondary meaning to be registrable as marks." *Kohler,* 125 USPQ2d at 1503-04 (citations and internal quotation marks omitted). "Acquired distinctiveness means that consumers have come to associate the mark with a single (even if anonymous) source." *Id.* at 1504 (citing *Inwood*, 214 USPQ2d at 4 n.11). "Applicant has the burden of demonstrating that its mark has acquired distinctiveness." *Change Wind*, 123 USPQ2d at 1467; *see also In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1265 (Fed. Cir. 2015).

"'[T]he lesser the degree of inherent distinctiveness, the heavier the burden to prove that [a mark] has acquired distinctiveness.'" *Kohler*, 125 USPQ2d at 1504 (quoting *In re Udor U.S.A. Inc.*, 89 USPQ2d 1978, 1986 (TTAB 2009)). "'While there is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness, the burden is heavier in this case because it involves product configuration[].'" *Id.* (quoting *In re Ennco Display Sys., Inc.*, 56 USPQ2d 1279, 1283-84 (TTAB 2008)); *see also Grote Indus.*, 126 USPQ2d at 1210 (noting that the burden of showing acquired distinctiveness "is heavier for product configurations than for

word marks"). That is because, as noted earlier, consumers are not predisposed to view product features as potential source-identifiers. *See Wal-Mart*, 54 USPQ2d at 1069.

Applicant claims that there are "hundreds (and possibly thousands) of [double-canopy] umbrellas for sale," 7 TTABVUE 9, and Applicant made of record what it describes as "online screen shots of double-canopy umbrellas of many other competitors."[70] *Id.* at 8. "[W]here, as here, many third parties are using similarly-shaped [umbrellas], 'a registration may not issue except upon a substantial showing of acquired distinctiveness.'" *Kohler*, 125 USPQ2d at 1504 (quoting *Udor*, 89 USPQ2d at 1986).

"'Acquired distinctiveness may be shown by direct and/or circumstantial evidence.'" *Id.* at 1506 (quoting *Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1554 (TTAB 2009)); *see also Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 128 USPQ2d 1739, 1743 (Fed. Cir. 2018) ("The Board and courts have recognized that both direct and circumstantial evidence may show secondary meaning") (citation omitted). "'Direct evidence includes actual testimony, declarations or surveys of consumers as to their state of mind. Circumstantial evidence is evidence from which consumer association may be inferred, such as years of use, extensive amounts of sales and advertising, and any similar evidence showing wide exposure of the mark to consumers.'" *Kohler*, 125 USPQ2d at 1506 (quoting *Stuart Spector Designs*, 94 USPQ2d at 1554). When the

---

[70] 5 TTABVUE 12-19.

evidence comprises indirect evidence such as the applicant's length and manner of use, it is usually expected that such indirect evidence will be "supplemented by evidence of the **effectiveness** of such use to cause the purchasing public to identify the mark with the source of the product." *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 422 (Fed. Cir. 1985) (emphasis added).

In the product design context, evidence of acquired distinctiveness "must relate to the promotion and recognition of the specific configuration embodied in the applied-for mark and not to the goods in general." *Change Wind*, 123 USPQ2d at 1467 (citing *Inwood Labs.*, 214 USPQ at 4 n.11); *see also In re SnoWizard, Inc.*, 129 USPQ2d 1001, 1005 (TTAB 2018) (citing *Converse, Inc. v. ITC*, 907 F.3d 1361, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018)). As discussed above, Applicant seeks registration of the entire design shown and described in its application, but it focuses on appeal solely on the mesh lower-canopy portion of the applied-for mark. The Examining Attorney also focuses on the evidence going to the distinctiveness of the mesh canopy.

Applicant's claim of acquired distinctiveness made with its application purports to be limited to only the mesh lower-canopy portion of the mark,[71] and on appeal, Applicant argues that its evidence "goes directly to the issue of acquired distinctiveness of the non-functional mesh portion of the design." 7 TTABVUE 12. Applicant does not address the other elements of the applied-for mark, or claim that the mark as a whole has acquired distinctiveness.

---

[71] February 22, 2017 Application at TSDR 1 (stating that the § 2(f) claim is "IN PART, BASED ON EVIDENCE").

The Examining Attorney responds that the non-distinctiveness "refusal is made as to the entire configuration of the umbrella," 9 TTABVUE 14, and that "Applicant does not dispute that the handle, shaft, runner, ribs and the solid canopies of the umbrella are nondistinctive design elements of applicant's goods." *Id.* She argues that Applicant's evidence "is insufficient to show acquired distinctiveness of the applied-for mark because most of the evidence does not show that the mesh portion alone has acquired distinctiveness as to the source of the goods," *id.* at 16, but that "even if the §2(f) in part claim was acceptable as to the mesh portion, the other elements of the mark, namely, the handle shaft, runner, ribs, and the solid canopies of the umbrella are nondistinctive product design elements." *Id.* at 17.

### B. Applicant's Direct Evidence

Applicant does not present a consumer survey. Applicant's direct evidence of acquired distinctiveness consists of Mr. Kupferman's declaration, and declarations of representatives of four sellers of Windbrella umbrellas and one of Windbrella's competitors. All of Applicant's declarants stated that they considered themselves to be experts "in the umbrella business,"[72] in the "marketing, sales, advertising, and buying of umbrellas,"[73] or in the "design, marketing, sales, advertising, buying and brand development in the field of umbrellas,"[74] and, as discussed below, all offered

---

[72] Kupferman Decl. ¶ 2.

[73] Hubsmith Decl. ¶ 5; Coulon Decl. ¶ 4; Wiesenberg Decl. ¶ 5; Willinsky Decl. ¶ 5.

[74] Zobel Decl. ¶ 4.

opinions on the ultimate question of acquired distinctiveness, as well as statements based on their personal knowledge.

### 1. Kupferman Declaration

Most of Mr. Kupferman's declaration concerns what he called "factors [that] have contributed to bringing wide recognition to all Windbrella umbrellas," including long use, sales and distribution, promotional activities, media and editorial comment, and policing efforts.[75] He also stated that "[s]ince we have been selling the Windbrella umbrella, we regularly receive phone calls requesting if we are the company that sells the double canopy, vented mesh umbrella;" that "several of our competitors have referred inquiries to us because the customers were looking for the unique design of the Windbrella umbrella;"[76] that the Windbrella umbrella "exhibits a number of distinctive features," including "a double canopy umbrella that includes a mesh portion of the lower canopy;"[77] and that "I do not know of any umbrella that possesses the combination of these distinctive features."[78] His declaration establishes that he is competent to address these matters on the basis of his own personal knowledge, and we address this testimony below in our discussion of Applicant's circumstantial evidence regarding what he called "customer recognition."[79]

---

[75] Kupferman Decl. ¶¶ 12-27.

[76] *Id*. ¶ 8.

[77] *Id*. ¶ 10.

[78] *Id*. ¶ 11.

[79] *Id*. ¶ 25.

Mr. Kupferman also opined, however, that the "Windbrella umbrella configuration and design has acquired secondary meaning in the industry and in the minds of consumers;"[80] that "the design's appearance is recognizable by retail consumers, promotional products customers, green grass and retail golf stores, golfers and retail buyers and members of the general public who notice the double canopy mesh vented system (the 'Windbrella umbrella') and are interested in high quality umbrellas;"[81] and that "[p]ersons in the trade and the general public interested in high quality and double canopy mesh vented umbrella designs, know and recognize Windbrella umbrellas when they see them, and they associate these umbrellas with Windbrella."[82] With these statements, Mr. Kupferman purports to establish acquired distinctiveness based on the state of mind of resellers and end users of Applicant's umbrellas.

## 2. Third-Party Declarations

As Applicant acknowledges, 7 TTABVUE 14, the declarations of the four resellers and one competitor are essentially form statements whose key substantive portions are identical.[83] Each declarant stated that "I believe that the Windbrella umbrella is

---

[80] *Id.* ¶ 12.

[81] *Id.* ¶ 7.

[82] *Id.*

[83] Applicant argues that each declaration "state[s] that the mesh lower canopy makes the umbrellas distinctive," and Applicant purports to "not understand why each of the declarants need[s] to state this fact in a different way," 10 TTABVUE 5, but "the probative value of the [declarations] is affected somewhat by the fact that they are all essentially identical in form and were clearly not composed individually." *In re Pohl-Boskamp GmbH & Co.*, 106 USPQ2d 1042, 1051 (TTAB 2013). They "are less persuasive than statements expressed in the declarants' own words." *Id.*

recognizable, and has become distinctive as representing Windbrella in the United States;" that he or she found "that the Windbrella umbrella features, especially the mesh vented double canopy feature, distinguish the Windbrella umbrella from other umbrellas on the market;" that the "mesh gives the Windbrella a clean design look that no other double canopy umbrella can show;" and that he or she has "received numerous specific requests for the Windbrella umbrella with the mesh vented double canopy figures."[84] These statements involve matters within the declarants' personal knowledge, and we will consider them for whatever probative value they may have, taking into account the overall deficiencies in their declarations discussed below.

Like Mr. Kupferman, however, each declarant offered "my opinion as an expert that the Windbrella umbrella is recognizable to fashion-conscious umbrella consumers, including customers and potential customers" of their respective companies,"[85] and that "[i]n the field of umbrellas, an umbrella having the mesh vented canopy feature is instantly recognizable as a Windbrella product."[86] These opinions purport to establish acquired distinctiveness based on the state of mind of "customers and potential customers" of the umbrella, including that the umbrella design is "instantly recognizable" to those persons as Applicant's product.

---

[84] Hubsmith Decl. ¶ 11; Coulon Decl. ¶ 9; Wiesenberg Decl. ¶ 9; Zobel Decl. ¶ 9; Willinsky Decl. ¶ 9.

[85] Hubsmith Decl. ¶ 9; Coulon Decl. ¶ 8; Wiesenberg Decl. ¶ 8; Zobel Dec. ¶ 8; Willinsky Decl. ¶ 8.

[86] Hubsmith Decl. ¶ 12; Coulon Decl. ¶ 11; Wiesenberg Decl. ¶ 10; Zobel Dec. ¶ 12; Willinsky Decl. ¶ 10.

### 3. Issues Regarding Declarants' Purported Expert Opinions

Mr. Kupferman's declaration establishes that he is an expert in the umbrella business, but we find that his declaration does not establish that he is qualified to opine as an expert witness that the applied-for mark is "recognizable by retail consumers, promotional products customers, green grass and retail golf stores, golfers and retail buyers and members of the general public," or that it "has acquired secondary meaning in the industry and in the minds of consumers." The third-party declarants similarly appear to be experts in the umbrella business, but we also find that their declarations do not establish that they are qualified to opine as expert witnesses that the design is instantly "recognizable to fashion-conscious umbrella consumers, including customers and potential customers" of their respective companies," as a Windbrella product. *See, e.g.*, *In re David Crystal, Inc.*, 296 F.2d 771, 132 USPQ 1, 2 (CCPA 1961) (12 affidavits from those in the trade indicating that the involved design mark indicated to the purchasing public that the applicant was the source were deemed insufficient and characterized as "most inadequate proof"); *cf.* Fed. R. Evid. 702 ("a witness is qualified as an expert by knowledge, skill, experience, training, or education"). Accordingly, we will treat the declarants as fact witnesses, and will consider their self-styled "expert" opinions as those that may be expressed by lay witnesses. *Cf.* Fed. R. Evid. 701 (discussing when lay witnesses can offer opinion testimony).

We give no weight to Mr. Kupferman's opinion on the ultimate issue that the "Windbrella umbrella configuration and design has acquired secondary meaning in

the industry and in the minds of consumers."[87] *Cf. In re Hikari Sales USA, Inc.*, 2019 USPQ2d 111514, *10 (TTAB 2019) (giving no weight to opinion of linguist regarding status of applied-for mark ALGAE WAFERS as a trademark because there was "no evidence suggesting that [he] is a trademark expert"); *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1047 (TTAB 2017) (giving no weight to "opinion testimony regarding the conclusions of law in this case" given by respondent's owner). We give very little weight to Mr. Kupferman's opinions that "the design's appearance is recognizable by retail consumers, promotional products customers, green grass and retail golf stores, golfers and retail buyers and members of the general public who notice the double canopy mesh vented system (the 'Windbrella umbrella') and are interested in high quality umbrellas,"[88] and that "[p]ersons in the trade and the general public interested in high quality and double canopy mesh vented umbrella designs, know and recognize Windbrella umbrellas when they see them, and they associate these umbrellas with Windbrella,"[89] because his declaration is vague as to the interactions with competitors, the trade, and consumers that appear to form the basis for these opinions.[90] *Id.* ("weigh[ing] the relevance and strength or weakness" of the testimony of respondent's principal, "including any limitations inherent therein"); *cf. Kohler*, 125 USPQ2d at 1483 (excluding testimony of industry expert regarding consumer perception of engine design as improper lay opinion testimony

---

[87] Kupferman Decl. ¶ 12.

[88] *Id.* ¶ 7.

[89] *Id.*

[90] *Id.* at ¶ 8, 12, 21, 25.

under Fed. R. Evid. 701 where the "details of the discussions . . . that led him to conclude that 'the overall look was easily identified throughout the industry' [were] not documented or otherwise specified"); *In re Automatic Radio Mfg. Co.*, 404 F.2d 1391, 160 USPQ 233, 236 (CCPA 1969) (affidavits of retailers who averred that they **observed** consumers asking for the brand by using the mark at issue were probative of secondary meaning).

With respect to the third-party declarants' opinions regarding consumer perception, they stated that "the reports from buyers and our customers aid my opinion as an expert that the Windbrella umbrella is recognizable to fashion-conscious umbrella consumers, including customers and potential customers."[91] No details regarding these "reports" are provided, however, and in the absence of such information, we give their opinions on these matters very little weight. *Kohler*, 125 USPQ2d at 1483. The testimony of Mr. Kupferman and the third-party declarants on these matters is not probative of acquired distinctiveness.

### 4. The Third-Party Declarants' Other Statements

As noted above, all five third-party declarations are essentially identical. Form statements may be used to show acquired distinctiveness, "but the ones here suffer from multiple deficiencies that vitiate their probative value on the issue of acquired distinctiveness." *Id.* at 1507 (quoting *In re Florists' Transworld Delivery Inc.*, 106 USPQ2d 1784, 1794 n.9 (TTAB 2008)).

---

[91] Hubsmith Decl. ¶ 9; Coulon Decl. ¶ 8; Wiesenberg Decl. ¶ 8; Zobel Dec. ¶ 8; Willinsky Decl. ¶ 8.

First, Mr. Kupferman identified the purchasers of Applicant's umbrellas as including "retail customers, promotional products customers, green grass and retail golf stores, golfers and retail buyers and members of the general public."[92] Two of the resellers are "promotional products customers,"[93] and it appears that the other two are "retail buyers," but there are no declarations from anyone representing any of the other categories, including golfers and other members of the general public, who are, of course, the ultimate end users of all of the umbrellas.

Second, it is not clear that Applicant's declarations are representative of Applicant's customer base given the multiple categories of Applicant's customers. Mr. Kupferman explained that "[o]n the wholesale level (e.g., sales to the promotional products industry), the Windbrella umbrella configuration and design line of umbrellas account for a significant portion of our business,"[94] but there are only two essentially identical declarations from that category,[95] and there are similarly only two essentially identical declarations from what appears to be the "retail buyer" category even though Mr. Kupferman stated that Applicant distributes 10,000-15,000 of its catalogs annually to "retailers throughout the United States and

---

[92] Kupferman Decl. ¶ 7.

[93] Ms. Zobel's company also appears to fall within this category, as she stated that it is "one of the top umbrella companies in the promotional products industry." Zobel Decl. ¶ 2.

[94] Kupferman Decl. ¶ 14. He stated that Applicant's wholesale sales "represent approximately 70% of the sales of the Windbrella umbrella." *Id*. ¶ 16.

[95] Wiesenberg Decl. ¶ 1 ("Haven is a nationally recognized promotional products business that markets and sells a wide variety of promotional products including umbrellas"); Willinsky Decl. ¶ 1 ("Casablanca is a promotional products business that markets and sells a wide variety of promotional products including umbrellas"). As noted above, Ms. Zobel's company is also in that category, but it is not one of Applicant's customers.

internationally."[96] In addition, as noted above, there are no declarations from end users.

The lack of representativeness reduces the probative value of the declarations somewhat, particularly given their essentially identical content. *Cf. Kohler*, 125 USPQ2d at 1508 (holding that "some degree of geographic and customer diversity is necessary for the declarations to have significant probative value" and finding that the applicant's declarations did not meet that standard where "[a]ll of the declarations are from distributors, even though the record shows that, in addition to distributors, OEMs, retailers, and rental yards, among others, are GX Engine customers"); *Mag Instruments, Inc. v. Brinkmann Corp.*, 96 USPQ2d 1701, 1723 (TTAB 2010) (sixteen nearly identical declarations submitted during prosecution to show acquired distinctiveness of mark on flashlights had "little persuasive value" because "[t]here is no evidence to suggest that this was a random selection of possible declarants" and "none of the declarants, except possibly one, is described as an end consumer").

Third, the declarants' recitations that their statements are based on personal knowledge provide little specific information that is useful in assessing acquired distinctiveness. Each declarant discussed, in very general terms, "the Windbrella umbrella features," including vague references to the "mesh vented double canopy feature,"[97] which is not the only element in the applied-for mark. Their statements

---

[96] Kupferman Decl. ¶ 17.

[97] Hubsmith Decl. ¶ 11; Coulon Decl. ¶ 9; Wiesenberg Decl. ¶ 9; Zobel Decl. ¶ 9; Willinsky Decl. ¶ 9.

that "I believe that the Windbrella umbrella is recognizable, and has become distinctive as representing Windbrella in the United States" and that they "find that the Windbrella umbrella features, especially its mesh vented double canopy feature, distinguish the Windbrella umbrella from other umbrellas on the market,"[98] say "little more than that each declarant is personally familiar with the [umbrella] and associates it with" Applicant. *Kohler*, 125 USPQ2d at 1508; *see also Pohl-Boskamp*, 106 USPQ2d at 1051 (criticizing form declarations that "merely assert[ed] that applicant's product is the only one in the marketplace having a peppermint flavor or scent" and that "each declarant is himself or herself familiar with applicant's product and associates its scent with applicant alone"); *cf. Automatic Radio*, 160 USPQ at 236. The declarants' statements that the "mesh gives the Windbrella a clean design look that no other double canopy umbrella can show"[99] similarly appear to express only their belief that Applicant's umbrellas alone contain this feature and are aesthetically more pleasing than those of competitors.

Finally, the identical statements of the four resellers that "I have received numerous specific requests for the Windbrella Umbrellas with the mesh vented double canopy feature" are vague and ambiguous.[100] The word "numerous" is imprecise, especially when used by four different declarants, and we cannot determine whether the requests were for "the Windbrella umbrellas" by name, which

---

[98] Hubsmith Decl. ¶ 11; Coulon Decl. ¶ 9; Wiesenberg Decl. ¶ 9; Zobel Decl. ¶ 9; Willinsky Decl. ¶ 9.

[99] Hubsmith Decl. ¶ 11; Coulon Decl. ¶ 9; Wiesenberg Decl. ¶ 9; Zobel Decl. ¶ 9; Willinsky Decl. ¶ 9.

[100] Hubsmith Decl. ¶ 11; Coulon Decl. ¶ 9; Wiesenberg Decl. ¶ 9; Willinsky Decl. ¶ 9.

would not be probative of the distinctiveness of the design, or were instead for unnamed umbrellas "with the mesh vented double canopy feature," which might be probative of the distinctiveness of the design depending on the specifics of each request.[101] These defects render these statements unhelpful, illustrating the perils of using form language rather than the declarants' own words.

For the reasons discussed above, we find that the third-party declarations are "not persuasive evidence of the acquired distinctiveness of the applied-for mark." *Kohler*, 125 USPQ2d at 1508. We turn now to Applicant's circumstantial evidence of acquired distinctiveness.

### C. Applicant's Circumstantial Evidence

Applicant offers multiple forms of circumstantial evidence, through Mr. Kupferman's declaration, regarding the long use of the applied-for mark,[102] sales and distribution of umbrellas comprising the design,[103] advertising and promotion of the umbrellas,[104] media coverage,[105] what Mr. Kupferman described as "customer recognition,"[106] and copying and enforcement.[107] We discuss each in turn.

---

[101] These statements also seem to focus on consumers' recognition of, or requests for, the design per se (i.e., an umbrella with the mesh feature that allows wind to pass through without inversion). Recognizing or asking for a product that has a particular desirable feature is different from understanding that there is one, and only one, source for the product. These unspecific statements do not establish the latter.

[102] Kupferman Decl. ¶ 13.

[103] *Id.* ¶¶ 14-16.

[104] *Id.* ¶¶ 17-22.

[105] *Id.* ¶ 23-24.

[106] *Id.* ¶ 25.

[107] *Id.* ¶¶ 26-27.

### 1. Length and Exclusivity of Use

Mr. Kupferman stated that "the distinctive configuration and design of the Windbrella umbrella has remained nearly the same since 1998,"[108] a period of nearly 20 years before the filing of the application, and that he was unaware "of any umbrella that possesses the combination of these distinctive features."[109] Long use of a mark "'is not necessarily conclusive or persuasive'" on acquired distinctiveness, *Kohler*, 125 USPQ2d at 1515 (quoting *Stuart Spector Designs*, 94 USPQ2d at 1571-72), but here it supports a finding of acquired distinctiveness to some extent because there is no evidence that competitive double canopy umbrellas had a mesh design between 1998 and 2017. *Cf. Kohler,* 125 USPQ2d at 1515 (long use not persuasive on issue of acquired distinctiveness where the applicant did "not dispute that during much of [the period of use] other general purpose utility engines in the marketplace have had similar configurations").

### 2. Sales and Advertising

Mr. Kupferman stated that "Windbrella has sold a total of over $40,000,000 of the Windbrella umbrellas since they were first sold in 1998," an amount that he claimed indicates that Applicant is "a major seller for these products."[110] He also stated that Applicant has advertised the goods to the trade and to the public since 1998 in Applicant's own catalogs and in third-party catalogs, via email, on Applicant's

---

[108] *Id.* ¶ 13.

[109] *Id.* ¶ 11.

[110] *Id.* ¶ 16.

website and third-party websites, and at trade shows.[111] He estimated that Applicant has expended "over $1,000,000 on catalogs, e-blasts and tradeshows for the advertising and promotional efforts . . . ."[112]

The Examining Attorney concedes that Applicant has "provided evidence of high sales figures and significant advertising expenditures for applicant's goods," but claims that "this evidence is not dispositive of applicant's claim." 9 TTABVUE 16. She argues that the sales and advertising evidence "may demonstrate the commercial success of applicant's goods . . . but not that relevant consumers view the matter as a mark," *id.*, and that Applicant's "advertising expenditures are merely indicative of its efforts to develop distinctiveness; not evidence that the mark has acquired distinctiveness." *Id.*

We credit Mr. Kupferman's claim that Applicant's sales figures are substantial in the umbrella industry, *cf. Hikari Sales*, 2019 USPQ2d 111514, *15-16, but we are less certain than the Examining Attorney that Applicant's advertising figures are "significant" taking into account that they are spread over nearly 20 years and appear to be directed overwhelmingly to the trade.[113] Even assuming that both sets of figures are significant, however, "'[i]t is well established that compelling sales and advertising figures do not always amount to a finding of acquired distinctiveness.'"

---

[111] *Id.* ¶¶ 17-19, 21.

[112] *Id.* ¶ 20.

[113] As discussed above in note 94, about 70% of Applicant's sales are at wholesale, and a significant portion of those sales involve promotional umbrellas bearing the marks of other companies. As a result, many umbrellas sold by Applicant bear other marks when they reach the ultimate consumer. We discuss below the challenge that this presents to establishing consumer recognition of the umbrella's design as Applicant's mark.

*Kohler*, 125 USPQ2d at 1516 (quoting *Stuart Spector Designs*, 94 USPQ2d at 1572). "[T]he more important question is how the alleged mark is being used, i.e., in what manner have consumers been exposed to the alleged mark so that we can impute consumer association between the configuration and the product producer." *Id.* (internal quotation omitted).

"'When advertisements are submitted as evidence of acquired distinctiveness, they must demonstrate the promotion and recognition of the specific configuration embodied in the applied-for mark and not of the goods in general." *Id.* (quoting *AS Holdings, Inc. v. H & C Milcor, Inc.*, 107 USPQ2d 1829, 1838 (TTAB 2013)). "The sort of advertising that can demonstrate that a trade dress has acquired distinctiveness is commonly referred to as 'look for' advertising; that is, advertising that directs the consumer to 'look for' the particular feature(s) claimed as a trademark." *Id.* We will examine Applicant's advertising to see whether it encourages consumers or the trade to view the applied-for design as Applicant's mark.

Applicant's advertising is confined to catalogs, emails, and websites, and it appears that the vast majority does not reach the ultimate consumers. Mr. Kupferman explained that Applicant's catalogs "are distributed to retailers throughout the United States . . . to promote and sell Windbrella products."[114] We reproduce below representative pages from each catalog in the record:

---

[114] Kupferman Decl. ¶ 17; Exs. A-C.





[115] *Id.* ¶ 17; Ex. A.

[116] *Id.* ¶ 17; Ex. B.





[117] *Id.*

[118] *Id.* ¶ 17; Ex. C.



These advertisements all stress the general benefits of use of what many describe as "The Better Umbrella" (with the one immediately above stating that its "Form follows function" and describing the "The Better Umbrella" as "Functional"), but they do nothing to encourage readers to associate the shape of the umbrella with Applicant.

The Cadillac Collection catalog for 2002-2003 displays and describes Applicant's umbrella as follows:



---

[119] *Id.*

F. 62" WINDBRELLA
Big enough for two! Vented technology allows umbrella to withstand wind gusts up to 60 mph. without inverting. Rubber grip handle. All fiberglass frame makes it lightweight and less conductive to lightning. Cadillac signature on two opposite panels. Solar Silver.
#40462 $42.00 [120]

This page identifies "Windbrella" as the source of the Cadillac umbrella, but it touts the usefulness of the umbrella, and does nothing to encourage readers to associate the claimed features of the umbrella with Applicant. *See, e.g.*, *Ennco Display Sys.*, 56 USPQ2d at 1285 (TTAB 2000) ("In this regard, at least one court has noted that 'advertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding'") (quoting *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 36 USPQ2d 1065, 1071-72 (7th Cir. 1995)).

The failure of Applicant's advertising to encourage readers to look for the claimed features of the umbrella as a symbol of its source is particularly significant in the context of promotional products such as the Cadillac umbrella shown above. As noted above, Mr. Kupferman stated that sales of the Windbrella umbrella to the promotional products industry represent a significant portion of Applicant's wholesale business.[121] As a result, and as shown in Applicant's catalogs, umbrellas

---

[120] *Id.* ¶18; Ex. E.

[121] *Id.* ¶ 14.

comprising the applied-for mark are frequently branded with the marks and logos of other companies,[122] such as Cadillac, Martini & Rossi,[123] and Lexus.[124] This sort of private labeling is, in and of itself, a significant hurdle in proving that the applied-for design has acquired distinctiveness because consumers and observers of the umbrellas see the design coming from multiple sources. *See Mine Safety Appliances Co. v. Elec. Storage Battery Co.*, 405 F.2d 901, 160 USPQ 413, 414-15 (CCPA 1969) (sales of "hard hats" bearing the applied-for configuration of the crown portion of the hat to a company that was allowed "to advertise and sell these hats under its own name and trademark" created a situation "which clearly would make it impossible for anyone to know, merely from looking at a hat, whether it originated with [the applicant] or with [the other company]"); *In re Hillerich & Bradsby Co.*, 204 F.2d 287, 97 USPQ 451, 454 (CCPA 1953) (bat manufacturer's claim that oval design on bat had acquired distinctiveness was undercut by the fact that the manufacturer permitted other companies to use their own marks and names within the oval on private label bats). A product "can bear more than one mark without diminishing the identifying function of each," *In re Morganroth*, 208 USPQ 284, 287 (TTAB 1980), but

---

[122] Many of these appear to be what two of Applicant's declarants described as "name brands." Mr. Wiesenberg claimed that his company "is recognized for providing high quality promotional products that include many name brands such as, 3M, BIC, Nike Golf, Coach, Fossil, Godiva, American Apparel, Hanes, Ralph Lauren, Tommy Hilfiger, Swiss Army, and Sony Electronics," Wiesenberg Decl. ¶ 4, while Mr. Willinsky claimed that his company "is also recognized for providing high quality promotional products that include many name brands such as, Nike, Adidas, Champion, Parker, Zippo, Mont Blanc, Callaway Golf, Bulova, Brookstone, Waterford, Citizen, and Stormtech." Willinsky Decl. ¶ 4.

[123] Kupferman Decl. ¶ 17; Ex. C.

[124] *Id.* ¶ 17; Ex. B. The *New York Times* article discussed above states that Applicant has also produced promotional umbrellas bearing the Saab, Porsche, and Mercedes-Benz marks.

Applicant's statements to its promotional customers in its catalogs make clear that Applicant's promotional line is focused on promoting marks other than Applicant's. They state, for example, that "[a]n effective promotional product must support a client's 'brand image'" and that "at Windbrella, we are committed to enhancing your client's brand,"[125] and they tout the effectiveness of Applicant's umbrellas in achieving these objectives:

> Imprinted with a company logo, this big, roomy umbrella becomes a walking billboard. Perfect for building brand awareness! When a client cares about their brand name, then only a quality Windbrella umbrella will represent their image effectively.[126]

To the extent that the umbrellas comprising the applied-for design prominently bear the word and design marks of companies other than Applicant as "walking billboards" for their brands, "look-for" messaging to focus consumer attention on Applicant's design itself would be all the more critical to establishing distinctiveness, but the advertisements for Applicant's promotional umbrellas do not employ it. *See, e.g., In re Soccer Sport Supply Co.*, 507 F.2d 1400, 184 USPQ 345, 348 (CCPA 1975) (advertising displaying a design along with word marks lacked the "nexus between applicant's design per se and a single source"); *In re McIlhenny Co.*, 278 F.2d 953, 126 USPQ 138, 140-41 (CCPA 1960) (promotion of a bottle design bearing other trademarks held to be insufficient to show that "the general public has accepted

---

[125] *Id.* ¶ 17; Ex. C.

[126] *Id.*

applicant's unlabeled bottles *per se* as identifying applicant's product so as to warrant registration of the bottle on the Principal Register even under *section 2(f)*").

Finally, Mr. Kupferman stated that Applicant advertises the umbrellas "via the internet at Windbrella's own internet site (www.windbrella.net) and the internet sites of others such as Umbrellas and Beyond, Coolibar and UV blocker."[127] Remarkably, there are no pages from Applicant's own website in the record, and the Coolibar and UV Blocker webpages in the record "showing the Windbrella umbrella"[128] do not even identify the umbrella as originating with Applicant:



[129]

---

[127] *Id.* ¶ 19. This consumer-facing advertising appears to involve a relatively small portion of Applicant's business, as Mr. Kupferman stated that "20% of sales are attributable to retail internet sales." *Id.* ¶ 16.

[128] *Id.* ¶ 19.

[129] *Id.* ¶ 19; Ex. F.



As a consequence, these examples undercut, rather than support, a finding of acquired distinctiveness. *See Mine Safety Appliances*, 160 USPQ at 415; *Hillerich & Bradsby*, 97 USPQ at 454 (applicant's manufacture of private label bats in which other companies' marks appeared in oval design in which manufacturer claimed rights was "clearly a circumstance detracting from the validity of its contention herein").

"'Look for' advertising refers to advertising that directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from that source. It does not refer to advertising that simply includes a picture of the product itself or touts a feature in a non-source identifying manner." *Kohler*, 125 USPQ2d at 1517

---

[130] *Id.* ¶ 19; Ex. G.

(quoting *Stuart Spector Designs*, 94 USPQ2d at 1572 (finding that advertisements featuring prominent "beauty shots" of guitar body shapes were not examples of "look-for" advertising and were not probative of acquired distinctiveness)). Applicant's consumer facing advertisements, like its ones to the trade, do little more than show the products,[131] and they do not establish that consumers associate the features of the applied-for mark with Applicant. *See Owens-Corning Fiberglas*, 227 USPQ at 423-24 (describing effective "look for" advertising); *In re Data Packaging Corp.*, 453 F.2d 1300, 1304, 172 USPQ 396, 398-99 (CCPA 1972) (same).

Applicant "has not presented any convincing evidence of advertising or promotional efforts that focus upon the trademark significance of the product configurations, rather than the utilitarian or desirable features of the products." *Ennco Display Sys.*, 56 USPQ2d at 1285. "On this record, the absence of advertising directing consumers to the specific features of the applied-for mark undermines Applicant's claim of acquired distinctiveness based upon its advertising." *Kohler*, 125 USPQ2d at 1517. Applicant's sales and advertising evidence does not make a persuasive showing of acquired distinctiveness. *Ennco Display Sys.*, 56 USPQ2d at 1284-86.

---

[131] Mr. Kupferman discussed display of the products at trade shows and during "market week," where they are viewed by retail buyers. *Id.* ¶¶ 21-22. Without evidence that the umbrellas are displayed in a manner that directs attention to their design, the display of the goods in these venues does not aid Applicant in establishing acquired distinctiveness. *Cf. Hikari Sales*, 2019 USPQ2d 111514, *16 (lack of information regarding applicant's use of its mark at trade shows reduced the probative value of that evidence).

### 3. Media Coverage

Mr. Kupferman stated that "[e]ditors and other individuals in the promotional products trade magazines and golf magazines have commented extensively on the umbrellas with our distinctive configuration and design,"[132] but only the *New York Times* article discussed above is of record, and it focuses on the benefits of the umbrella in avoiding inversion. He also claimed that the umbrellas have been associated with celebrities through their use at golf tournaments.[133]

This evidence is quite sparse, and insufficient to establish acquired distinctiveness because there is no evidence that the media coverage and celebrity uses have focused on the design as an identifier of the source of the goods.[134] *See Stuart Spector Designs*, 94 USPQ2d at 1575 (finding that examples of exposure of guitar bodies through third parties' permitted or licensed use in various media, including television, live performances, movies, charitable events, and merchandising, did not direct potential consumers to identify the guitar bodies as an indication of commercial source, and were not probative of acquired distinctiveness).

### 4. Customer Recognition

Mr. Kupferman claimed that "customers often ask for the signature Windbrella umbrellas in the retail stores."[135] He also stated, at different places in his declaration,

---

[132] Kupferman Decl. ¶ 23.

[133] *Id.* ¶ 24; Ex. I.

[134] The umbrella carried by professional golfer Natalie Gulbis that is mentioned in Mr. Kupferman's declaration is notably a promotional product bearing the word mark and logo of the TaylorMade golf company. *Id.*; Ex. I.

[135] *Id.* ¶ 25.

that it is "very common for Windbrella to receive phone calls asking if we have the double canopy mesh vented umbrella,"[136] and "requesting if we are the company that sells the double canopy, vented mesh umbrellas."[137]

These statements are not probative of acquired distinctiveness. Assuming that Mr. Kupferman has personal knowledge regarding customer requests made to unidentified retailers, his statements about them are ambiguous. We cannot determine whether consumers ask for Windbrella umbrellas by name when they buy them at retail, which would not be probative of the distinctiveness of the design, or whether customers ask for the umbrellas in a way that shows that they uniquely associate the design with Applicant, which would.

His statements regarding phone calls to Applicant are similarly ambiguous. It is not clear whether his claim that consumers ask whether Applicant is "the company that sells the double canopy, vented mesh umbrellas" reflects identification of those features with Applicant as the source of the goods, or simply an inquiry to Applicant as a potential supplier of that type of umbrella. We find that Mr. Kupferman's statements about purported consumer recognition have little, if any, probative value on the issue of acquired distinctiveness.

### 5. Copying and Policing Activity

Finally, Mr. Kupferman discussed in general terms Applicant's actions against companies that he described as selling "umbrellas that infringe the Windbrella trade

---

[136] *Id.*

[137] *Id.* ¶ 8.

dress," which he stated is "embodied in Windbrella's design patent U.S. Des 408,125."[138] He stated that Applicant has "successfully defended against" three umbrella manufacturers and a clothing company, all of which "agreed to stop sales of their umbrellas," and has expended more than $100,000 in legal fees in these efforts.[139]

As noted above, the record does not contain evidence of the sale between 1998 and 2017 of a mesh double canopy umbrella by competitors or unrelated third parties, indicating that Applicant's enforcement efforts have been successful. At the same time, in the absence of more information regarding the disputes, such as copies of demand letters and responses, and settlement agreements, "we are not convinced that competitors intentionally copied the subject configurations to trade on applicant's asserted distinctiveness as the source of the products." *Ennco Display Sys.*, 56 USPQ2d at 1286. "[I]t is more common that competitors copy product designs for desirable qualities or features," *id.*, and we cannot find from Mr. Kupferman's unspecific statements that the production of the alleged infringers' umbrellas reflected attempts to trade on Applicant's goodwill rather than unsuccessful attempts to obtain the utilitarian benefits specified and claimed in the '506 Utility Patent, which Applicant claims to have enforced. 7 TTABVUE 9. "We are unable to determine from the record whether the parties [settled] in recognition of the acquired distinctiveness of applicant's product configurations, in view of applicant's patents on

---

[138] *Id.* ¶ 26.

[139] *Id.*

the configurations, or in order to settle litigation." *Ennco Display Sys.*, 56 USPQ2d at 1286; *see also Hikari Sales*, 2019 USPQ2d 111514, *5-6, 9-10; *see generally In re Wella Corp.*, 565 F.2d 143, 196 USPQ 7, 8 n.2 (CCPA 1977) ("Appellant argues that various letters (of record) from competitors indicating their discontinuance of use of its mark upon threat of legal action are evidence of its distinctiveness, but we agree with the TTAB that such evidence shows a desire of competitors to avoid litigation rather than distinctiveness of the mark"). We find that Applicant's enforcement efforts are not probative of the acquired distinctiveness of the applied-for mark.

### 6. Summary and Conclusion Regarding Acquired Distinctiveness

While the preceding discussion focused on the sufficiency of each of the specific types of evidence offered by Applicant, the record, when considered in its entirety, establishes that Applicant has not met its burden of making a substantial showing that the applied-for product configuration mark has acquired distinctiveness.

**Decision**: The refusal to register is affirmed on both grounds.